**RECORD NO. 13-4335**

IN THE

# United States Court of Appeals

**FOR THE FOURTH CIRCUIT**

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RANDAL MCLEAN,

*Defendant-Appellant.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE  DISTRICT OF MARYLAND
AT BALTIMORE

(Honorable George L. Russell, III, U. S. District Court Judge)

———————————

**OPENING BRIEF OF APPELLANT
RANDAL MCLEAN**

———————————

William A. Mitchell, Jr.
BRENNAN McKENNA, CHARTERED
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
(301) 474-0044 Telephone
(301) 474-5730 Facsimile
wmitchell@bsm-legal.com

*Counsel for Appellant*                     September 30, 2013

# TABLE OF CONTENTS

Table of Authorities ................................................................................... ii

Statement of Subject Matter Jurisdiction & Appellate Jurisdiction .........................1

Statement of the Issues..................................................................................1

Statement of the Case...................................................................................1

Statement of the Facts..................................................................................2

Summary of the Arguments ........................................................................18

Arguments

I.      The district court committed reversible error in denying the appellant's motion to suppress the keys seized from him because, under a totality of the circumstances, the officers lacked the probable cause required to subject the appellant to full-blown arrest.......................................................................18

II.     The district court committed reversible error in granting the government's motion to admit evidence of prior criminal conduct because the prior conduct occurred six years before the instant conduct, was in no way relevant or necessary to prove the crime charged, was confusing to the jury, and was unfairly prejudicial to the appellant ................................................33

Conclusion ...............................................................................................40

Request for Oral Argument.........................................................................41

Certificate of Compliance ..........................................................................41

Certificate of Service ................................................................................42

i

# TABLE OF AUTHORITIES

## CASES

*Devenpeck v. Alford*,
    543 U.S. 146 (2006)............................................................20

Santos v. Frederick County Bd. of Commissioners,
    ___ F.3d ___ 2013 WL. 4008189 (4th Cir. 2013)........................20

*Florida v. Bostick*,
    501 U.S. 429 (1991)............................................................20

*Ornelas v. United States*,
    517 U.S. 690 (1996)........................................................19, 26

*Terry v. Ohio*,
    392 U.S. 1 (1968)..............................................................20

*United States v. Al-Talib*,
    55 F.3d 923 (4th Cir. 1995) .................................................32

*United States v. Bumpers*,
    705 F.3d 168 (4th Cir. Jan. 16, 2013)..................................22, 24

*United States v. Davis*,
    690 F.3d 226 (4th Cir.  2012) ..............................................18

*United v. Day*,
    591 F.3d 679 (4th Cir. 2010) ...............................................19

*United States v. Day*,
    591 F.3d 679 (4th Cir. 2010) ...............................................19

*United States v. Foster*,
    634 F.3d 243 (4th Cir. 2011) ...............................................25

*United States v. Hernandez*,
    975 F.2d 1035 (1995) .....................................................38, 39

*United States v. Hodge*,
    354 F.3d 305 (4th Cir.2004) ...........................................................................34

*United States v. Humphries*,
    372 F.3d 653 (2004) .......................................................................................28

*United States v. Johnson*,
    599 F.3d 339 (4th Cir. 2010) ....................................................................26, 27

*United States v. Johnson*,
    617 F.3d 286 (4th Cir.2010) .....................................................................34, 39

*United States v. Jones*,
    204 F.3d 541 (4th Cir. 2000) ....................................................................32, 33

*United States v. McBride*,
    676 F.3d 385 (4th Cir. 2012) .............................................................34, 35, 38

*United States v. McCoy*,
    513 F.3d 405 (4th Cir. 2008) ....................................................................29, 30

*United States v. Rawle*,
    845 F.2d 1244 (4th Cir. 1988) ........................................................................37

*United States v. Rusher*,
    966 F.2d 868 (4th Cir. 1992) ..........................................................................19

*United States v. Seidman*,
    156 F.3d 542 (4th Cir.1998) ...........................................................................19

*United States v. Sprinkle*,
    106 F.3d 613 (1997) .................................................................................30, 31

*United States v. Weaver*,
    282 F.3d 302 (4th Cir.2002) ...........................................................................20

*United States v. Wells*,
    163 F.3d 889 (4th Cir. 1998) ..........................................................................38

*Welsh v. Wisconsin*,
    466 U.S. 740 (1984)...........................................................................................18

## STATUTES

21 U.S.C. § 841..............................................................................................1, 2
28 U.S.C. § 1291...............................................................................................1
18 U.S.C. § 1952.............................................................................................37
18 U.S.C. § 3231...............................................................................................1
18 U.S.C. § 3742...............................................................................................1
18 U.S.C. § 922 (g)...........................................................................................2

## UNRECOGNIZED

Fed. R. Crim. Pro. 404 (b) ..............................................................34, 35, 36, 37, 40

## STATEMENT OF SUBJECT MATTER JURISDICTION & APPELLATE JURISDICTION

The defendant-appellant, Randal McLean, appeals his final judgment of conviction and sentence imposed on April 25, 2013. Mr. McLean timely noted this appeal on April 26, 2013. Mr. McLean was convicted of one count of possession with intent to distribute a controlled dangerous substance in violation of 21 U.S.C. § 841. The United States District Court for District of Maryland was a court of original subject matter jurisdiction pursuant to 18 U.S.C. § 3231. The United States Court of Appeals for the Fourth Circuit has over jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

I.    Did the district court commit reversible error in denying the appellant's motion to suppress tangible evidence seized from him pursuant to a warrantless arrest and search?

II.   Did the district court commit reversible error in granting the government's motion to admit evidence of the appellant's two prior instances of criminal conduct, which occurred roughly six years before the appellant's arrest in this case?

1

## STATEMENT OF THE CASE

On June 30, 2010, the grand jury sitting in the United States District Court for the District of Maryland at Baltimore issued a superseding indictment against Mr. McLean, charging him with one count of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841 and one count of possession of a firearm and ammunition by a prohibited person in violation of 18 U.S.C. § 922 (g).[1]

Following a hearing on Mr. McLean's motion to suppress evidence and a hearing on motions *in limine*, the case proceeded to trial before a jury on November 1, 2012. At the trial's conclusion, Mr. McLean was found guilty of possession with intent to distribute cocaine and not guilty of possession of ammunition by a prohibited person. On April 25, 2013, the district court sentenced Mr. McLean to 120 months in the custody of the Federal Bureau of Prisons, followed by three years of supervised release. The district court also imposed a special assessment of $100.00. Mr. McLean timely noted this appeal the following day.

---

[1] On February 23, 2012, the grand jury issued a second superseding indictment, charging Mr. McLean with (Count I) conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 841, (Count II) possession with intent to distribute cocaine in violation of 21 U.S.C. § 841, and (Count III) possession of a firearm and ammunition by a prohibited person in violation of 18 U.S.C. § 922 (g). The government did not proceed to trial on this indictment, and it was dismissed at Mr. McLean's sentencing.

## STATEMENT OF THE FACTS

### I.    Summary of Facts

On March 3, 2010, officers of the Baltimore City Police Department arrested an unidentified person on a matter unrelated to the allegations in this case. From that person, they elicited general information about drugs being sold from a "stash house" on the 2200 block of Guilford Avenue in Baltimore, Maryland. The unidentified informant, with whom the officers had no prior history of any sort, did not describe which drugs were being sold, any specific times or quantities, or any specific person involved in the sales.

Officers reported to the area and established surveillance on the alley behind the houses on the 2200 block of Guilford Avenue. From their vantage point and with the aid of one pair of binoculars, they were able to see an unidentified man wearing jeans, a sweatshirt, and a black cap approach the rear door of 2204 Guilford Avenue and open it with a padlock. The man went inside for about thirty seconds before exiting, locking the door, and leaving. He later returned accompanied by another unidentified man, entered the house alone, came out, locked the door, and handed the man whom accompanied him a "packet of some sort." The two men walked out of the alley and the first man motioned with his hand. Two additional men, also unidentified, approached the second man and

3

exchanged what the officers believe may have been money for two small packages. All four men then departed the area.

Armed with no further information, the officers entered an unmarked cruiser and went to search for the first unidentified man. They found someone they believed was him and immediately arrested him without further investigation; they got out of their car, placed him in handcuffs without any questions, and conducted a full-blown search of him. During the search, they recovered only a set of keys and nothing else of interest. At no time did they ask him questions. At no time did they attempt to speak with, or even locate, any of the other men they observed that morning. At no time did they see any actual contraband. The person they arrested was the appellant, Randal McLean.

They took Mr. McLean and the keys back to 2204 Guilford Avenue, which they entered and cursorily searched without a warrant. Seeing what they believed to be small vials of cocaine, they exited the house, secured it, and applied for and obtained a warrant for both the house itself as well as Mr. McLean's personal home. From the search of 2204 Guilford Avenue, the officers recovered various vials and packaging materials, as well as five rounds of ammunition. At trial, the total accounted weight of cocaine was between eleven and fourteen grams. From Mr. McLean's personal residence, they recovered a digital scale and empty gel capsules.

4

Before trial, Mr. McLean moved to suppress the keys seized from him, arguing that there was insufficient probable cause available to the officers to have subjected him to a full-blown arrest and search. The district court denied the motion. Also before trial, the government moved to admit into evidence two of Mr. McLean's prior convictions involving "hand-to-hand drug transactions" from 2004, on the ground that it established Mr. McLean's "knowledge of the drug trade." The district court granted the motion. Mr. McLean now appeals both rulings.

## II.    The Appellant's Motion to Suppress Physical Evidence

By pleading filed on September 29, 2010, Mr. McLean challenged, *inter alia*, the lawfulness of his arrest, the subsequent seizure of a key resulting from that arrest, and the following search of a nearby house from which a small amount of cocaine and five rounds of ammunition were recovered (JA 19-24).[2] The issue was resolved at a February 3, 2012 hearing. The facts elicited at the hearing, and those found by the district court, follow.

On or about March 3, 2010, an unidentified person was arrested in Baltimore, Maryland for a narcotics violation. Officer Stephen Mays, who was not involved in the arrest of the unidentified person, interviewed him/her regarding

---

[2] Mr. McLean does not challenge the search warrants or search of the house in this appeal.

5

potential illegal drug activity in the area of Guilford Avenue in Baltimore. (JA 105, 14-145). Officer Mays did not know the arrestee, had no prior history from which to determine his/her reliability, and denied making any promises in exchange for the information given. *Id*. According to Officer Mays, the unidentified arrestee described drugs being sold from a vacant dwelling on the 2200 block of Guilford Avenue in Baltimore, accessed via a rear door from an alley. (JA 105). The unidentified arrestee provided no further information: he/she identified no suspects, no times or days, and did not identify a house from which the drugs were allegedly being sold. (JA 106).

The following morning, Officer Mays, accompanied by Officers Streett and Latanzi, went to a vacant dwelling in the area to establish surveillance. (JA 111). The vacant dwelling was situated across a park, with a view of the alley of the 2200 block of Guilford Avenue. JA 112). Officer Mays had a pair of binoculars, while his fellow officers did not. (JA 113).

At about 8:00 a.m., roughly thirty minutes after the officers had established their surveillance, an individual wearing a grey sweatshirt, blue jeans, and a black hat entered the alley of Guilford Avenue. (JA 114). The person walked into the rear yard of 2204 Guilford Ave, appeared to use a key to remove a padlock from its rear door, and entered the dwelling. (JA 117). No further description of the person was given and the officers did not recognize him. The person was inside for about

6

thirty to forty seconds before he came out of dwelling, shut the door, and left the yard, all the while talking on a cell phone. (JA 118).

At about 9:00 a.m., the person re-entered the alley, accompanied by another individual. (JA 119-120). The first person entered the same dwelling, while the second person did not. (JA 121-122). About thirty seconds later, the first person came back outside, again locked the padlock, and approached the second person outside of the yard. *Id.* The first person removed an object that Officer Mays described as a "packet of some sort" and handed it to the second person. (JA 123). While Officer Mays could not identify the object, he described it as being "consistent with street level narcotics," and testified that he believed he had witnessed a "hand-to-hand drug transaction." (JA 124). Both people left the rear yard of 2204 Guilford Avenue to a nearby street, where the first person motioned with his hand. (JA 126-127). Two more people approached, walked past the first person, and went to the second person (the one to whom the first person had handed the packet). (JA 126-127). They handed him what the officer believeed may have been money and he handed them some objects. Thereafter, everyone walked away. (JA 127).

The officers exited their surveillance position and entered an unmarked vehicle. (JA 129). Sometime later, they saw an individual they believed to be the person who had twice entered the rear door of 2204 Guilford Avenue and who had

7

handed the object to the second person. They stopped the car, exited, placed handcuffs on the person, and thoroughly searched him. (JA 131). Officer Mays did not recall asking the person any questions. This person would turn out to be Randal McLean. A set of keys was taken from him; nothing else of interest was recovered from the search. (JA 131).

Taking Mr. McLean with them, they returned to 2204 Guilford Avenue, put the recovered key in the padlock on the rear door, and entered the house. (JA 132). Without a warrant, the officers searched all three floors to "clear it" and "make it safe." (JA 133). They did not "turn things over or open things up." *Id.* There was no one else in the house. *Id.* In an already-opened kitchen cabinet, Officer Mays found black vials containing a white substance. The officers left and secured the house, which Officer Mays testified was owned by the Baltimore Housing Authority (JA 142), and applied for and obtained a search warrant. *Id.* A small amount of cocaine, along with five rounds of ammunition and various packaging materials, was recovered and would later be admitted as evidence at Mr. McLean's trial. Meanwhile, the officers performed a background check on Mr. McLean and discovered his home address, which they described as being "near where all this happened this morning." They applied for and obtained a search warrant for that dwelling as well. (JA 137).

8

On cross-examination, Officer Mays reiterated that the unidentified informant had been placed under arrest by a different unit with the Baltimore police department, and that the officers had no prior history with him/her. (JA 145). The officers did not know the circumstances of the informant's arrest, and the informant provided only general information about the 2200 block of Guilford Avenue (CH 53). Moreover, the informant knew nothing about the specific activity alleged, nor did he/she identify Mr. McLean. (JA 151).

The dwelling from which the officers surveilled the alley was roughly a block away, across the park, and those officers unaided by binoculars were not able to identify any details of the alleged transaction between Mr. McLean and the second person; Officer Latanzi was not able to identify Mr. McLean's face and could only identify him by clothing. (JA 204). No pictures were taken during the surveillance. (JA 156). None of the officers had any prior interaction with Mr. McLean, and none of them recognized the person who went into the house. (JA 163). Officer Mays described the person, as he exited the house, as "pretty normal, he looked pretty natural," and did not notice anything unusual about his behavior. (JA 166).

The two people who would later approach Mr. McLean (who Officer Latanzi could not describe other than being "just two black males" (JA 212) and the second person never interacted with Mr. McLean. (JA 182). No drugs were

witnessed changing hands, just a packet. (JA 185). No one other than Mr. McLean was ever stopped and no drugs or money were ever recovered from anyone. Mr. McLean was – no questions asked – stopped and was immediately arrested, placed in handcuffs, searched, and transported back to the house. (JA 188). Upon the foregoing, the district court made the following findings of fact:

> I believe that Detective Mays, who had been working for approximately eight years for the Baltimore City Police Department, and had experience in the field of narcotics, received information on March 2, 2010. It appears to me how that happened is that some other individual was arrested for allegedly being involved in narcotics. That individual, as I think from other testimony I've heard over the years, not unusually, was brought to be debriefed or interviewed by other officers upon some finding that he had information that somebody thought might be interesting. We don't really know the precise background of that. I don't think we need to. This other person who had been arrested was brought in to talk to Detective Mays by other officers and provided certain information that illegal narcotics were stored in this vacant building on the even side of Guilford Avenue, that someone was taking these narcotics in and out of that vacant building…This is not a reliable informant that has provided information in the past. He was not apparently anonymous, but other than that, had not established any history of reliability. I'm crediting that Detective Mays didn't promise him anything. I will certainly assume that this person, whoever it was, was hoping to benefit himself by providing the information.

> This is background information. This clearly would not have been enough in itself to get a warrant or make an arrest. I think it is a factor. It is something that the officer could consider, certainly explains why he and his partners decided the next morning to go, apparently consistent with the times that this individual had indicated there might be activity at the house, to go to that area, conceal themselves on the third floor of another vacant building on Calvert Street from which they had, other than the distance, what appears to me to be a relatively

10

unimpeded view, both based on the government's photographs and the defense photographs, from a position on the third floor, as indicated, across to the rear door areas of several locations on Guilford, one of which turned out to be the back door of 2204. That is the one of interest. I will credit Detective Mays' testimony, corroborated by Officer Lattanzi, that he had binoculars with him. I don't think that's unusual or surprising that an officer conducting surveillance would bring binoculars. I believe, crediting Officer Lattanzi, that people, and frankly, just from looking at the pictures, that people could have been seen in any event. The binoculars certainly would give a better, although not perfect, view of what was happening.

They went there at approximately 7:30, at approximately 8:00 or 8:15 observed an individual, later identified as Mr. McLean, the defendant here, wearing a gray sweat shirt and blue jeans, and possibly some sort of hat. They saw him come from the alley. As I am looking at Government's Exhibit Number Eleven, it would be on the right-hand side, but come from an alley beside the house, walk into the rear yard, use a key apparently, or in some way unlock what appeared to be a padlock, some device securing the rear door, and go into the house, exit in approximately thirty or forty seconds, which is consistent with going in simply to retrieve something rather than any other activity within the house, re-securing the door, walking out of the yard with apparently some sort of cell phone conversation going on.

They remained on the third floor and at some time after that, say approximately 9:00 a.m., both Detective Mays and Officer Lattanzi observed a gentleman that turned out to be Mr. McLean, enter through a different alley, as I am looking at Government's Exhibit Eleven, on the left-hand side of the house. He, on this occasion, had someone else with him. They went into the rear alley behind 2204 Guilford. With the second individual waiting in the alley, Mr. McLean again went in with what appeared to be a key unlocking the door, again, stayed just long enough to retrieve something, came back out, re-secured the door, and went to the second person, still standing in the alley, removed an object from his sweat shirt, a package of some kind, consistent with what Detective Mays believed to be narcotics packaging.

11

Most significantly, from there what was observed was that both Mr. McLean and the other individual to whom this package had been given, moving slightly along back towards the intersection of that alley on the left-hand side, that Mr. McLean was then seen to motion with his hand, as though waving to someone to come towards them. Two individuals did come in from Guilford, from the alley at least, went past Mr. McLean to the individual who had been handed the package. Both Detective Mays, and to some extent Officer Lattanzi, but particularly Detective Mays with the binoculars, were able to observe approximately simultaneous transactions, exchanges of what appeared to be currency, bill form, from the two new individuals, and in turn, they were given small objects retrieved from the package that Mr. McLean had given the other individual. Mr. McLean walked out towards Guilford. All three followed at some point shortly thereafter. I think based on those observations, and the experience that both Detective Mays and Officer Lattanzi possessed at this time, they were certainly reasonable to believe that they had just seen Mr. McLean engage in a felony narcotics transaction, similar to what they had seen on other occasions. So they then went and got in their car and went to look for Mr. McLean, found him at approximately 23rd and Barclay, where he was arrested.

(JA 254-257).

The district court then concluded, *inter alia*, that there was sufficient probable cause to arrest Mr. McLean based upon the information believed by the officers at the time they arrested him:

So the first key point is whether there was probable cause leading up to that arrest, and I think clearly that there was. The officers are entitled to rely on the totality of the circumstances presented to them, what their observations were, and their experience. I will find that they had probable cause again to believe that Mr. McLean had indeed been involved in narcotics transactions. Following that, and I don't think it is particularly significant who did the handcuffing or who retrieved the key, there was a key at least or keys recovered from Mr. McLean which fit the padlock on the back of the door.

12

It is not completely really necessary to get into the rest of it, but I will also find, based on all the circumstances that have been presented to me in the record today, that Mr. McLean did not have any legitimate expectation of privacy in this house. It certainly appears from all the pictures to have been a boarded up and abandoned house. It appears, and I think there is relevance to the tax records that show that about a year later the city owns this house. When we speak of a key, and Mr. McLean having a key, which can certainly be a factor of importance in evaluating expectation of privacy, this was not an ordinary door with an ordinary key. It was a padlock that someone had affixed to the back of this otherwise abandoned building to, it would seem most likely to me from the evidence, to secure something of value inside the house, which appears to have been the drugs. But in any event, I don't see that Mr. McLean had any legitimate expectation of privacy in this house. So even if they did not legitimately, the officers did not legitimately come in possession of the key that opened the padlock, they could have, and I believe would have, based on their observations, but certainly they could have gone into the house, and I don't see that Mr. McLean would have had a basis to object in terms of any legitimate expectation of privacy.

Again, I don't know that it is particularly necessary to get into it, and it is essentially undisputed, except that when the officers entered the house to secure it, that there were what appeared to be drugs observed in plain view in the open cabinet. They subsequently obtained warrants. The warrants themselves appear to be well-supported by probable cause. I neglected to mention Officer Hayes as well. Obviously he was not there in the beginning. He assisted in the search, but I don't think really adds anything that I am remembering at the moment at least to the probable cause analysis. Although I have not necessarily mentioned all of them specifically, as I indicated, I am taking into account all the exhibits that were introduced, including the pictures introduced by the defense. I think I've got a fairly good picture of what this area looked like in everybody's likely vantage point, which I appreciate.

(JA 257-261).

13

### III.    The Government's Motion to Admit "Other Bad Acts" Evidence

By pleading filed on January 11, 2012, the government moved to admit evidence of Mr. McLean's three prior convictions for street-level distribution of drugs arising from incidents having occurred in 1998, January, 2004, and February, 2004. (JA 62-71). Mr. McLean objected by pleading filed on February 1, 2012. (JA 90-94). The dispute was addressed at a hearing on motions *in limine* on October 19, 2012. The government withdrew its request to admit the conviction from 1998, but persisted in its request for the admission of the convictions stemming from January and February, 2004. After hearing argument, the district court granted the government's request. Subsequently, at trial, the government called witnesses to testify as to the facts giving rise to those convictions.

### A.    January 19, 2004

The following recitation of facts is taken from the government's pretrial request to admit Mr. McLean's conviction stemming from an arrest that occurred on January 19, 2004:

> On January 19, 2004, an undercover officer was in the area of Barclay Street and 20th Street when the officer observed Alan Bell yelling, "homicide, homicide" which was known by the officer to be the street name for heroin sold in the area. The undercover officer spoke to Bell who directed him into an alley. As the undercover officer approached the alley, Bell yelled to Tyrell Green, "you got one coming." Randall McLean then approached the undercover officer and the undercover officer agreed to purchase four gelatin capsules of heroin for forty dollars. McLean then left the undercover officer's sight for

14

approximately 30 seconds. McLean then returned and handed the undercover officer four gelatin capsules containing heroin. The undercover officer gave McLean forty dollars pre-recorded departmental currency. The undercover officer then left the area and notified an arrest team. The arrest team responded and detained Bell, Green, and McLean until they were positively identified by the undercover officer. Once identified, all three suspects were placed under arrest. The forty dollars of pre-recorded departmental currency was recovered from Randall McLean. A search was conducted for the stash location. Officers responded to the rear yard of 323 East 21st Street and recovered 66 gelatin capsules of heroin from under the porch. Officers also recovered 17 vials of cocaine from the rear yard of 328 East 20 ½ Street.

(JA 64). At trial, over a renewed defense objection, Sergeant Christopher Talley

testified to events essentially consistent with the foregoing. (JA 515-525).

## B.    February 13, 2004

The following recitation of facts is taken from the government's pretrial

request to admit Mr. McLean's conviction stemming from an arrest that occurred

on February 13, 2004:

On February 13, 2004 an undercover officer was in the area of the 2100 block of North Barclay Street to make drug purchases. The undercover officer encountered Randall McLean who stated, "shirls here." The undercover understood McLean to be advertising cocaine. The undercover indicated that he was interested in making a purchase. McLean asked how many and the undercover officer requested two. The undercover officer then provided McLean with twenty dollars pre-recorded departmental currency and McLean reached into his pants pocket and produced two black top vials of cocaine which he handed to the undercover officer. The officer left the area and notified an arrest team. The arrest team conducted continuous surveillance of McLean while waiting for the undercover officer to leave the area. McLean was then approached and detained. The pre-recorded buy

15

money was seized from McLean's left front pants pocket. McLean attempted to flee but was immediately apprehended and arrested. Six black top vials of cocaine were recovered from his right front pants pocket. An additional $427 was recovered from McLean's other pockets. The undercover officer then re-entered the area and confirmed that McLean was the person who sold him cocaine.

(JA 63). At trial, over a renewed defense objection, Sergeant Michael Collins testified to events essentially consistent with the foregoing. (JA 527-537).

Without waiving his objection, Mr. McLean entered into a stipulation with the government that Mr. McLean was found guilty in each incident:

Ladies and gentlemen, the parties stipulate that the arrest of the defendant on January 19, 2004 Baltimore City Police report number 04310708 resulted in a conviction for distribution of heroin after the defendant pleaded guilty, Baltimore City Circuit Court case 8104033088. The parties also stipulate that the arrest of the defendant on February 13, 2004, Baltimore City Police report number 043B06798 resulted in a conviction for distribution of cocaine after the defendant pleaded guilty, Baltimore City Circuit Court case number 1040610514.

(JA 554).

## IV.    Other Evidence Admitted at Trial

Officer Mays testified at trial to generally the same facts as set forth in the February 2, 2012 hearing on Mr. McLean's motion to suppress, informing the jury as to his observations during surveillance, the arrest of Mr. McLean and the recovery of the keys from him, and the search of 2204 Guilford Avenue. He testified to the recovery of sixty black-topped vials and three small plastic bags

16

containing a total of 7.12 grams of cocaine, various "street-level" packaging items, and five rounds of ammunition (JA 349-357). Officer Mays also testified to the search of Mr. McLean's personal residence, from which unused gel caps and a digital scale were recovered.

The government also called Officers Latanzi and Streett as well as Special Agent Doug Ellington of the Drug Enforcement Administration, who testified as an expert in the area of drug trafficking, explaining to the jury the concepts of a stash house, and offered generalized testimony on packaging of street-level quantities of drugs. The government also called Mr. McLean's probation officer for the ostensible purpose of proving his residence, as well as the officers involved in the 2004 arrests of Mr. McLean described above.

Mr. McLean called a defense witness for the purpose of establishing the distance between 2204 Guilford Avenue (roughly 120 yards), as well as witnesses who testified that he was not the sole resident of his home address (from which a digital scale and empty gel caps were recovered and admitted into evidence). The government established a brief rebuttal case before resting. None of the matters raised by the defense or the government's rebuttal are at issue in this appeal. The jury acquitted Mr. McLean of possession of ammunition and convicted him of possession with intent to distribute cocaine.

17

## SUMMARY OF THE ARGUMENTS

I.     The district court committed reversible error in denying the appellant's motion to suppress the keys seized from him because, under a totality of the circumstances, the officers lacked the probable cause required to subject the appellant to full-blown arrest.

II.    The district court committed reversible error in granting the government's motion to admit evidence of prior criminal conduct because the prior conduct occurred six years before the instant conduct, was in no way relevant or necessary to prove the crime charged, was confusing to the jury, and was unfairly prejudicial to the appellant.

## ARGUMENTS

I.    **THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN DENYING THE APPELLANT'S MOTION TO SUPPRESS THE KEYS SEIZED FROM HIM BECAUSE, UNDER A TOTALITY OF THE CIRCUMSTANCES, THE OFFICERS LACKED THE PROBABLE CAUSE REQUIRED TO SUBJECT THE APPELLANT TO FULL-BLOWN ARREST.**

### A.      Standard of Review

Upon a motion to suppress evidence obtained pursuant to a warrantless seizure, the government bears the burden of demonstrating that the seizure was reasonable. *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984). This Court reviews the factual findings underlying a motion to suppress for clear error and the district court's legal determinations *de novo*. *United States v. Davis*, 690 F.3d 226 (4th Cir.

18

2012) citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996) and *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir. 1992). "When a suppression motion has been denied, this Court reviews the evidence in the light most favorable to the government." *Id.* citing *United States v. Seidman*, 156 F.3d 542, 547 (4th Cir.1998).

### B.    Applicable Law & Argument

The parties to this case do not dispute that the officers arrested Mr. McLean within the meaning of the Fourth Amendment; the government has not argued – and the district court did not conclude – otherwise. ("So they then went and got in their car and went to look for Mr. McLean, found him at approximately 23rd and Barclay, where he was arrested." (JA 163.). The officers exited their unmarked cruiser, stopped Mr. McLean, placed him in handcuffs, and searched his pockets with sufficient vigor to retrieve the key to the padlock on 2204 Guilford Avenue. They then placed him in their unmarked cruiser and transported him back to that address. It is beyond question that a reasonable person in Mr. McLean's position would have felt that he was under arrest. *See e.g. United States v. Day*, 591 F.3d 679 (4th Cir. 2010) ("An individual is in custody when, under the totality of the circumstances, a suspect's freedom from action is curtailed to a 'degree associated with formal arrest…The operative question is whether, viewed objectively, a reasonable man in the suspect's position would have understood that he was in custody." (Internal citations and quotations omitted)).

19

Rather, the question for this Court is whether the officers had the probable cause required for the arrest, or merely the reasonable suspicion required for an investigative detention. As the Court has recently noted:

> [T]he Supreme Court has identified three categories of police-citizen encounters. *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir.2002). Each category represents differing degrees of restraint and, accordingly, requires differing levels of justification. See *id.* First, "consensual" encounters, the least intrusive type of police-citizen interaction, do not constitute seizures and, therefore, do not implicate Fourth Amendment protections. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). **Second, brief investigative detentions – commonly referred to as "Terry stops" – require reasonable, articulable suspicion of criminal activity**. Terry, 392 U.S. at 21. **Finally, arrests, the most intrusive type of police-citizen encounter, must be supported by probable cause**. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2006).

*Santos v. Frederick County Bd. of Commissioners*, ___ F.3d ___, 2013 WL 4008189 (4th Cir. 2013) (emphasis added and citations to unofficial reporters omitted).

The pertinent facts known to the officers at the time they arrested Mr. McLean, as found by the district court, are as follows:

- An informant arrested on an unrelated matter by other officers told the officers that drugs were being sold from a vacant house on the 2200 block of Guilford Avenue.

- The informant had no prior history at all with the officers.

- The informant did not identify a house from which drugs were being sold.

- The informant did not identify who was selling the drugs or who was buying them.

- The officers established surveillance on an alley on the block and saw a man enter what they believed to be an abandoned house, using a key to enter through the rear door.

- This man left and returned with another man, going inside and coming out, handing the man a "packet of some sort." There was nothing unusual or unnatural about the man's behavior.

- Those two men then went to a street where the first man motioned with his hand. Two additional men approached

- One of the two men – not the man who entered the house – gave each of the two men a packet and was given what the officers believed may have been money.[3]

- At no time was anyone stopped and asked questions.

- At no time were any drugs seen or recovered.

- The officers did not recognize any of the men.

Given the officers' training and experience, the foregoing facts *may* support

reasonable suspicion to have stopped the man they believed to be the one who

entered the house and detain him temporarily for further investigation. Indeed, the

officers *may* have had reasonable suspicion to detain any of the four men for

---

[3] Officer Mays, the only officer equipped with binoculars, could not even identify whether the men exchanged actual currency:

**Question:** "With regard to the currency, you couldn't see anything you could actually identify as currency, either, correct?
**Answer:** I couldn't. I believed it was bill form, but –
**Question:** You weren't sure?
**Answer:** I didn't tell the denominations, no.
**Question:** You couldn't tell exactly what it was.
**Question:** With regard to the second transaction, it occurred in the same way; is that right?
**Answer:** It was consistent with the first one.

21

further investigation, and probably should have. Instead, they immediately arrested and searched Mr. McLean. However, Mr. McLean has been unable to glean a single case from this circuit in which the foregoing facts would be sufficient, alone, to justify a full-blown arrest.

Reasonable suspicion, **not probable cause**, was found in *United States v. Bumpers*, 705 F.3d 168 2013, wherein this Court affirmed the district court's denial of the appellant's motion to suppress evidence.[4] The Court found controlling the following four factors present in that case:

> First, although the high-crime nature of the area in which a stop is performed is plainly not alone enough to support a reasonable suspicion of criminal activity…Officer Tinsley testified during the suppression hearing that the convenience store where he observed Bumpers and his companion was part of a shopping plaza where "multiple shootings" and "countless drug arrests" had taken place. Indeed, the very place where Bumpers was standing was an area where trespassers were commonly found. Officer Tinsley was keenly aware of the area's criminal history on the evening in question, in no small part because the store owner had filed a formal request with the police to "enforce criminal violations" on the premises.
>
> Second, the particular location and manner in which Bumpers and the other man were standing suggested that they may have been engaged in the **specific, ongoing crime of trespassing**…The area where the men were standing was posted "no trespassing," and Officer Tinsley could legitimately

---

[4] The dissent in *Bumpers* found the factors set out here insufficient to support even the reasonable suspicion necessary to have jusitifed even detaining the appellant: "Here, the circumstances found by the district court are insufficient to support Officer Tinsley's decision to stop Bumpers." *Id.* at 179 (Diaz, J., dissenting)

22

note that a dumpster in a completely different place from the store's entrance was not a natural spot for customers to be just standing around. Moreover, no evidence was presented during the suppression hearing suggesting that Bumpers or the other man were carrying shopping bags or any other items that would have indicated that they had been lawful patrons of the store.

Third…Bumpers's "evasive behavior" upon seeing Officer Tinsley's patrol car was another "pertinent factor" that contributed to the reasonable suspicion determination…Officer Tinsley even testified that Bumpers's reaction was consistent with a pattern of evasive activity that trespassers routinely engaged in at that exact location: "[E]verybody does the same thing in this area...they are back there on the…around that corner behind the dumpster [and] they immediately start to walk away" upon seeing the police. In addition, Bumpers's attempt to quickly vacate the premises and evade the police was suspicious in another regard: it was conduct more consistent with that of a trespasser than that of a lawful customer of the convenience store.

Finally, Officer Tinsley testified that when Bumpers left the premises, he took a path that led him past the convenience store's front door—and yet he made no effort to enter. This route did nothing to dispel the officer's suspicion that Bumpers was neither a prior nor future lawful customer of the store. That is, the fact that Bumpers walked at a "quick pace" right by the entrance without entering suggested that he had not been standing by the dumpsters with some intention to shop at the store in the future. The route also made it unlikely that Bumpers had been a customer at the store immediately prior to seeing Officer Tinsley, because if that were so, it would have made little sense for him to exit the store heading in one direction (north, towards the side parking lot) only to then double back and retrace his steps in the opposite direction when it came time to leave. In other words, as the district court noted, Bumpers walked away from the spot where he was standing at a "quick pace," in exactly the reverse direction that he would have taken had he actually earlier left the store as a legitimate customer.

23

*Id.* at 175-176 (internal citations and quotations omitted and emphasis added). None of the erratic behavior of the appellant in *Bumpers* is present in this case. At no time did Officer Mays describe the man in the back of 2204 Guilford Avenue as anything but "normal" and "natural."

> **Question:** As he approached this area from the alley and went up those back steps, you didn't see him do anything unusual; is that correct?
>
> **Answer:** Not from what I remember.
>
> **Question:** You didn't see anything in his hands; is that correct?
>
> **Answer:** Not from what I recall.
>
> **Question:** No unusual movements; is that correct?
>
> **Answer:** He did look pretty normal. He looked pretty natural. I don't know what you classify as unusual.
>
> **Question:** Just for you. You are a trained observer. You weren't seeing anything that struck you as unusual at that point; is that correct?
>
> **Answer:** I don't remember seeing anything unusual.

(JA 168). More importantly, the men in *Bumpers*, who reasonably seemed like trespassers in front of the store, were standing right next to a no-trespassing sign and, thus, arguably the officer had at least a basis to believe they were committing the crime of trespassing. There is nothing of the sort present in this case, for the officers did not know who, if anyone, owned the house the man was entering (heaven forbid a man enter his own house if that house is located on a block from

24

which some arrestee, "hoping to benefit himself,"[5] tells officers drugs are being sold).

No reasonable suspicion, let alone **probable cause**, was found in *United States v. Foster*, 634 F.3d 243 (4th Cir. 2011), where the officer detained the appellant because of "…his prior knowledge of Foster's criminal record; Foster's sudden appearance from a crouched position in a parked car, immediately after the driver had apparently said something to him after seeing the detective walking towards them; and Foster's frenzied arm movements, including the movement of his arms down toward the floor of the car." *Id.* at 246 (footnotes omitted).

Though the holding in *Foster* is certainly helpful to Mr. McLean, perhaps the most important point is the Court's admonition that "[A]n officer and the Government must do more than simply label a behavior as 'suspicious' to make it so. The Government must also be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *Id.* at 248.

This is important because the only thing about Mr. McLean's case that made the passing of the package from him to the second person was Officer Mays' "training and experience." "A police officer may draw inferences based on his own

---

[5] This is how the district court described the unidentified informant. (JA 254).

experience in deciding whether probable cause exists…" *Ornelas v. United States*, 517 U.S. 690, 700 (1996). However, while Mr. McLean does not suggest that any fact in this case be viewed in a vacuum, millions of packages are handed to millions of people every day for cash. That a police officer deems this to be "suspicious" in his "training and experience" should not, by itself, be sufficient to arrest a person for having the misfortune of living on a block from which illegal drugs may be sold.

In *United States v. Johnson*, 599 F.3d 339 (4th Cir. 2010), this Court articulated what appears to be something of a factual continuum between reasonable suspicion to detain and probable cause to arrest. The Court first determined that the circumstances surrounding the appellant's conduct gave rise to a lawful investigatory detention, then, when during that detention the appellant threw a heroin gelcap out of his hand, the Court found probable cause for his arrest arose.

> In this case, Officer Bannerman had an objective basis to think that Johnson was selling drugs. Johnson's conduct was entirely consistent with drug dealing. He was observed making similar hand-to-hand contact with multiple people and appeared to be waiting to meet them. The hasty, even furtive, nature of this series of encounters was much in keeping with an illicit handoff. Moreover, it is hard to imagine what else Johnson could have been doing. The only innocent explanation Johnson offers is that he could have been greeting the men he touched. But his conduct was hardly consistent with a social interaction. The other men did not linger or engage in conversation. They approached quickly and just as quickly quit the scene.

26

These observations, however, are only the beginning. The fact that this activity was taking place in a location well known for street-side drug-dealing alters the landscape of reasonable inferences…Johnson appeared to have been caught in the very act of drug-dealing for which the area was renowned. On top of that, one of the two suspected buyers who seemed to be following Johnson into the Chinese restaurant veered off at the sight of the police.

For all these reasons, Johnson's suggestion that upholding the denial of his suppression motions means that the police will be permitted to detain any person who is seen touching hands with someone else in a high crime area is well off the mark. There is nothing to suggest that the series of contacts in question were in any way social and much to suggest that they were instances of illegal drug dealing. Where there is a plausible claim to be made that a suspect has been caught in flagrante delicto, Terry standards are most often satisfied. Since Officer Bannerman did not violate Johnson's Fourth Amendment rights by requiring him to open his hands in the brief period before he attempted to arrest Johnson, evidence concerning the gelcap that Johnson threw during that period was not subject to suppression.

*Id.* at 345-346. All of these indicia, and any indicia comparable them, are absent from the case Mr. McLean presents for this Court's review. Absent are the "hasty, even furtive" movements; absent is the area "renowned" for drug-dealing; absent are the "hand-to-hand" contacts with multiple people. Most importantly, to the probable cause analysis, absent is the evidence of a "gelcap" or any contraband. Officer Mays himself testified he was unable to describe what type of package one man gave the other. He merely believed that the packages were of a size "consistent with street-level narcotics sales."

27

If the officers in this case had *probable cause* to believe they witnessed a drug sale, a fair question is what drug did they believe had been sold? To the extent that probable cause (and even reasonable suspicion) requires "particularized fact," it seems not too high a burden for the police to identify a particularized crime. For example, in *United States v. Humphries*, 372 F.3d 653 (2004), this Court found probable cause to arrest where the officers detected the **smell** of marijuana:

> The court found that as Officers Venable and Carr exited their vehicle in a high-crime area of Richmond, "they observed [Humphries] pat his waist area." From 20 feet away, the officers detected the distinct odor of marijuana, and they continued to smell the marijuana as they approached Humphries and another man standing nearby. As the officers drew near, Humphries "turned and began to walk away," and "Officer Venable told him to stop." Humphries did not stop but walked away at "a quick pace." As Officer Venable followed "between 5 and 10 feet" behind Humphries, he continued to smell "the distinct odor of marijuana." The district court found that Officer Venable directed Humphries to stop "on two occasions" but Humphries ignored the orders. When Humphries approached a residence on the 3100 block of Fifth Avenue and knocked on the door, "Officer Venable stood at the foot of the stairs and still smelled ... the odor of marijuana around the defendant." After Humphries was admitted into the premises by a woman, Officer Venable followed him and placed him under arrest. The district court recognized that Officer Venable was an experienced police officer and "what he had at that time in front of him was the odor of marijuana emanating from the defendant at the distance of between 5 and 10 feet…We have repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place.

*Id.* at 658. Prior to the arrest and search of Mr. McLean (and, for that matter, even during and immediately after), the officers could not articulate what drug they

28

believe he had distributed, relying instead on the mere assertion that the man in the rear yard of 2204 Guilford Avenue had engaged in conduct that was "consistent with a narcotics transaction." ("**I couldn't describe the actual object that he handed to him**. I knew an approximate size, because it was small enough to fit in his hand. Based on my experience, I knew that to be consistent with street-level quantities of narcotics." (JA 123).

Reasonable suspicion, **not probable cause**, was found in *United States v. McCoy*, 513 F.3d 405 (4th Cir. 2008), wherein this Court reversed the district court's suppression of evidence. The facts set out in *McCoy* were far more developed and particularized than those found here:

> (1) nearly 50% of the drug deals in Loudoun County occur in public parking lots; (2) both the Safeway and Food Lion parking lots visited by McCoy and the tow-truck driver were often meeting places for drug deals; (3) drug dealers often engage in counter-surveillance techniques, including changing the location of the drug deal at the last minute; (4) Loconti observed McCoy and his girlfriend drive into the Safeway parking lot and then sit in the car for several minutes; (5) after the tow-truck driver asked McCoy where he wanted to meet, McCoy pointed in a southerly direction; (6) the tow-truck driver and McCoy then traveled from the Safeway parking lot to the Food Lion parking lot approximately a quarter-mile south and did not enter either store; (7) Loconti observed McCoy enter the cab of the tow truck and then exit it after about only a minute; (8) the tow truck performed no towing services and began to leave before Loconti reached McCoy; and (9) when Loconti whistled for the tow-truck driver to stop after the tow truck pulled out of the Food Lion parking lot, the tow-truck driver "responded by driving away at a high rate of speed.

29

*Id.* at 412-413. Reversing the district court, this Court found that the totality of the foregoing facts were sufficient to permit the officer to **detain** the appellant, which is what the officer did. Thereafter, the officer interviewed the appellant and his girlfriend, the latter of whom told the officer that the appellant had just sold drugs to the man in the tow truck. She then consented to a search of her vehicle, wherein the officer found marijuana and cash. *Id.* at 408-409.

In this case, the officers did not detain Mr. McLean for further investigation; they immediately arrested him. No one told the officers Mr. McLean had dealt drugs to anyone. No one (including Mr. McLean) ran away from the officers. The officers recovered neither drugs nor cash from anyone. No one gave the officers consent to search anything because the officers did not even ask anyone. In fact, the officers at the suppression hearing did not testify that the 2200 block of Guilford Avenue was a "high-crime" or "high-drug" area; instead relying upon the uncorroborated word of a confidential informant with whom they had never before spoken.

No reasonable suspicion, let alone *probable cause*, was found in *United States v. Sprinkle*, 106 F.3d 613 (1997), a case with a fact pattern startlingly similar to this case. This Court found the following factors, considered together, to be **insufficient** to justify an investigatory detention:

30

(1) Officer Riccio knew that Poindexter had a criminal record and had recently been released from prison after serving time for narcotics violations, (2) the subjects were spotted in a neighborhood known by the officers for high (narcotics) crime, (3) when Sprinkle entered the Cougar, he and Poindexter huddled toward the center console with their hands close together, (4) as Officer Riccio walked past the car, Poindexter put his head down and his hand up to his face as if to avoid recognition, and (5) Poindexter drove away as soon as the officers walked by the car.

*Id.* at 617. The critical point here is how the Court viewed the third factor:

According to the government the particular acts of suspicious behavior started when Poindexter and Sprinkle huddled toward the center console with their hands close together. When Officer Riccio saw this, he got "the impression that they were in the midst of a narcotics transaction." But it would take more for this impression to qualify as a reasonable suspicion. Here, as Officer Riccio walked by, he could see into the car and see the hands of both men: **he saw no drugs, no money, no weapons and no drug paraphernalia. Nor did he see either man try to conceal any object.**

*Id.* In the case before the Court now, the officers at no time saw drugs, weapon, or paraphernalia, though Mays (with the assistance of binoculars), testified that he saw the second man (not Mr. McLean) receive what may have been money (he was not even sure of this) from the third and fourth man. Thus, there is nothing on the record involving illegal drugs other than Detective Mays' bald belief. That belief, this Court has cautioned, is not sufficient for an investigative detention. It is, ergo, not sufficient for an arrest.

The government's response to Mr. McLean's motion to suppress tangible evidence cites two cases to support the proposition that probable cause existed to arrest him:

> Based on the nature of the detectives' observations, along with reasonable inferences that can be drawn therefrom, under the totality of the circumstances, there was probable cause to arrest the defendant. *See United States v. Al-Talib*, 55 F.3d 923, 931 (4th Cir. 1995) (holding that police surveillance will support a finding of probable cause where officers observe conduct that is consistent with a drug transaction); *see also United States v. Jones*, 204 F.3d 541, 543 (4th Cir. 2000) (holding that officers had probable cause to arrest the defendant before he entered his grandmother's home where (1) they observed the defendant take part in an apparent drug transaction in a high drug area; (2) when the defendant observed the police, he began to walk away and the suspected buyer attempted to swallow a small bag containing white powder; and (3) the defendant ran into the residence when ordered by police to stop).

(JA 29). *Al-Talib*, however, involved a **seven-day investigation**, the genesis of which was the arrest of a coconspirator in possession of **ninety kilograms of marijuana**. Thereafter, federal agents seized an additional **800 pounds of marijuana** from a warehouse. The conspirator decided to cooperate with federal agents, who established **controlled purchases**, video surveillance, and **monitored phone calls**. *Al-Talib*, 55 F.3d at 926-927. To compare *Al-Talib* to this case for the purpose of a probable cause analysis borders on shameful. There is more intellectual honesty in applying *Jones*, wherein probable cause was found to

32

support an arrest where (unlike here) the officers actually **saw drugs**. *Jones*, 204 F.3d at 543.

### C.    Conclusion

The facts elicited at the suppression hearing and trial supported, at most, a finding of reasonable articulable suspicion necessary to justify a temporary investigative detention of Mr. McLean. It is simply not demanding too much of the police to expect them to conduct some sort of investigation to corroborate their suspicions before subjecting a citizen to a full-blown arrest. From that arrest, they retrieved the key that fit the lock to 2204 Guilford Avenue. As, without the key, no one at trial (including the officers) recognized or could positively identify Mr. McLean as the person who had entered the house and retrieved the package, the key was the only actual piece of evidence linking him to the contraband found there. Thus, the district court committed reversible error by denying his motion to suppress the keys.

## II.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN GRANTING THE GOVERNMENT'S MOTION TO ADMIT EVIDENCE OF PRIOR CRIMINAL CONDUCT BECAUSE THE PRIOR CONDUCT OCCURRED SIX YEARS BEFORE THE INSTANT CONDUCT, WAS IN NO WAY RELEVANT OR NECESSARY TO PROVE THE CRIME CHARGED, WAS CONFUSING TO THE JURY, AND WAS UNFAIRLY PREJUDICIAL TO THE APPELLANT.

### A.    Standard of Review

33

This Court reviews evidentiary rulings of the district court for abuse of discretion. *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir.2004).

**B.    Applicable Law & Argument**

The appropriate procedure for determining the admissibility of "other bad acts" evidence pursuant Fed. R. Crim. Pro 404 (b) was most recently articulated in this Court's decision in *United States v. McBride*, 676 F.3d 385 (4th Cir. 2012):

> We have provided a four-factor test for courts to consider when determining the admissibility of prior "bad acts" evidence: (1) The evidence must be **relevant** to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be **necessary** in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be **reliable**. And (4) the evidence's probative value must not be substantially **outweighed by confusion or unfair prejudice** in the sense that it tends to subordinate reason to emotion in the fact-finding process.

*Id.* at 396 citing *United States v. Johnson*, 617 F.3d 286, 296 (4th Cir.2010). In *McBride*, this Court found an abuse of discretion where the district court admitted, in the appellant's trial for possession with intent to distribute cocaine, evidence of an eighteen-month old incident wherein the appellant was involved in the manufacture and distribution of crack cocaine. Finding the evidence to qualify as "other bad acts" evidence under Fed. R. Crim. Pro. 404 (b), the Court found it

34

sufficiently reliable but neither relevant nor necessary to prove the crime with which the appellant was charged. It is the discussion of these two factors, as well as the potential for confusion of the issues and the danger of unfair prejudice, that are helpful here.

"For evidence to be **relevant**, it must be sufficiently related to the charged offense. The more closely that the prior act is related to the charged conduct in time, pattern, or state of mind, the greater the potential relevance of the prior act." *Id.* at 397 (internal citations and quotations omitted). The Court found the prior evidence in *McBride* insufficient to satisfy this prong:

> McBride was indicted for possession of cocaine with the intent to distribute for events that occurred on August 12, 2009. The evidence provided by Blanding was unrelated in time, place, pattern, or manner to the conduct for which McBride was indicted. Certainly, the events of January 14, 2008 were not "exceedingly similar" to the events that transpired at the club. The incident involving Blanding occurred one and one-half years before the events at the club. While this timeframe is not dispositive, such a significant passage of time had the effect of attenuating any relevance that could be afforded to the evidence.

> We further observe that McBride was not charged in this case with manufacturing crack cocaine, or even with possession with intent to distribute crack cocaine. Although this difference in type of narcotic, standing alone, would not merit exclusion of the evidence, it is yet another distinction separating the events of January 14, 2008 from the events of August 12, 2009.

> Additionally, the prior "bad acts" that occurred on January 14, 2008, involving McBride's attempted manufacture of crack cocaine and his expressed willingness to sell crack cocaine, bear no discernible relationship to the charge of possession of cocaine with the intent to

35

> distribute for which McBride was on trial. The government was not attempting to prove that the cocaine in McBride's possession was to be used for the manufacture of crack cocaine. The government also failed to identify any connection between the location of the January 14, 2008 transaction, McBride's residence, and the club where the activities occurred on August 12, 2009.

*Id.* In Mr. McLean's case, both incidents of prior criminal conduct occurred in early 2004, more than six full years before the conduct in this case. The January, 2004 incident involved a direct sale of heroin (a different type of narcotic than the one charged here) capsules to an undercover police officer on the street. The February, 2004 incident involved a direct-sale of cocaine (albeit in "black-top vials") to an undercover officer. While these incidents occurred in the same general neighborhood as the present case, the government did not allege a conspiracy at trial. Thus, it is difficult to see how two events, six years old, had any probative value to the crime charged here. One of the events involved a different type of drug altogether and neither "direct sale" shared the same *modus operandi* as the crime charged here.

"[This Court has] held that evidence is **necessary**, for purposes of establishing an exception under Rule 404(b), when that evidence is an essential part of the crimes on trial or when that evidence furnishes part of the context of the

crime." *Id.* at 398.[6] The Court found the prior conduct insufficient to satisfy this standard as well:

> In the present case…Blanding's testimony failed to serve a comparable role in McBride's trial, and was not "necessary" to establish McBride's intent regarding the events at the club. The events of January 14, 2008 did not provide any context regarding the events of August 12, 2009, and none of the charges against McBride required proof of ongoing activity in order to secure a conviction. Additionally, the government did not present a basis for concluding that Blanding's testimony was an essential part of the crimes on trial.

*Id.* As part of its analysis, the Court discussed four Fourth Circuit decisions on Fed. R. Crim. Pro. 404 (b).

In *United States v. Rawle*, 845 F.2d 1244 (4th Cir. 1988), the defendant was charged with a violation of 18 U.S.C. § 1952. The Court found the admission of the prior importation of marijuana was necessary to prove an essential element of that violation: a course of conduct. *Id.* at 1248. Similarly, the indictment upon which Mr. McLean proceeded to trial did not charge a conspiracy, nor did it have as an element a course of conduct. It was wholly unnecessary to show how the present conduct (possession with intent to distribute cocaine) fit into any other scheme or conduct.

---

[6] The Court also cautioned: "Although a defendant's plea of not guilty places at issue all elements of the charged crimes, this does not throw open the door to any sort of other crimes evidence." *Id.* at 398 (internal citations omitted).

In *United States v. Wells*, 163 F.3d 889 (4ᵗʰ Cir. 1998), the defendant was brought to trial for, *inter alia*, interference with the activities of I.R.S. officials. The government moved for admission of a tax-fraud scheme allegedly committed by the defendant years prior. The district court agreed and this Court affirmed, finding that admission of the prior conduct showed the defendant's rationale for the charged offenses:

> **The evidence is clear that Wells' acts toward the IRS directly resulted from the fraudulent tobacco scheme and tax evasion**. Margaret Davis, a former IRS agent, testified that she audited Wells' returns for the years 1988–91 and determined that Wells owed taxes for unreported income earned from the tobacco scheme.
>
> As a result, she referred his report to the IRS criminal division. Because of the audit, the IRS made a $1.8 million assessment against Wells and began attempts to enforce it through liens. Wells responded to the liens two years later by sending the threatening letters that formed the basis of the indictment on Counts 1, 4 and 5. Some of the letters even referenced the specific dollar amount — $1,852,929 — of the liens.
>
> Moreover, Wells presented a $3.7 million comptroller warrant — the subject of the bank fraud charges in Counts 3 and 11 — to pay his tax bill — the $1,852,929 tax bill.

*Id.* at 896 (emphasis added). Contrariwise, the crime charged against Mr. McLean was discrete and not part of any other activity. Thus, there was no necessity to show context to anything.

The Court in *McBride* found the evidence in the appellant's case to be similar to that in *United States v. Hernandez*, 975 F.2d 1035 (1995) and *United*

38

*States v. Johnson*, 617 F.3d 286 (4th Cir. 2010). In *Hernandez*, the district court admitted the following testimony at the defendant's trial for conspiracy with intent to distribute cocaine:

> Romulo DeLeon, who was testifying pursuant to a plea agreement in an unrelated drug case, related that he had met [the defendant] at the clothing store where he worked. The meeting occurred more than six months before the acts alleged in the indictment. He testified that Hernandez had told him that she knew a special recipe for cooking crack "to make more quantity while you are cooking it." He said she had told him that she knew the recipe because "she used to do that, sell that in New York."

*Hernandez*, 975 F.2d at 1037. This Court reversed, finding the evidence unrelated to the cocaine for which the defendant was on trial. As such, this Court determined, it had little value other than to show that the defendant was a drug-dealer. *Id.* at 1041. Likewise, the six-year-old incidents in which Mr. McLean sold small amounts of heroin and cocaine on the street are wholly unrelated to the crime charged here and have no other value than showing that he is a pattern-dealer of drugs.

Finally, in *Johnson*, a five-year old incident in which the defendant habitually provided cocaine to a customer who was not part of the alleged conspiracy, was insufficient to satisfy the Fourth Circuit's four-part test for the admissibility of "prior bad acts" evidence:

> The drug transactions that [the witness] alleged he conducted with Johnson occurred in 1998, nearly five years before the charged

39

conspiracy allegedly began in this case. Not only was the testimony remote in time, but [the witness] did not link Johnson to any of the other co-defendants…[the witness] merely described the transactions he alleged that he conducted with Johnson, which were neither directly nor indirectly related to the charged conspiracy. Even the description of the nature of the drug transaction — exchanging money at Johnson's rim shop before meeting at a bar to exchange the drugs — did not relate to the manner in which Holloway described transacting business with Johnson… We therefore cannot find that Timpson's testimony was sufficiently related to the charged offense to render it adequately relevant to prove intent or knowledge. When, as here, the proponent of Rule 404 (b) evidence cannot demonstrate that the evidence satisfies our four-part test for admissibility, we must notice error; in such circumstances, the Rule has been administered impermissibly to convict a defendant on the basis of bad character, or to convict him for prior acts, or to try him by ambush.

*Id*. at 298 (internal citations omitted). Mr. McLean's case does not even involve a conspiracy. Likewise, Mr. McLean's 2004 sales of heroin and cocaine (made directly on the street to a buyer) have nothing in common with the conduct the officers here believed they observed (having an intermediary make the sales on his behalf).

## C.    Conclusion

The admission at Mr. McLean's trial of two six-year-old incidents involving street-level sales of small quantities of controlled substances were wholly irrelevant to the crime charged, and were necessary neither to prove an element of that crime nor to give it context. It follows that the admission of the evidence, demonstrating to the jury that Mr. McLean is a two-time drug dealer, was unfairly

40

prejudicial as it had no probative value whatsoever. Therefore, the district court abused its discretion in permitting the government to admit the two 2004 incidents.

## CONCLUSION

For the reasons set forth herein, the appellant's judgment of conviction must be vacated and the case remanded to the district court for further proceedings.

## REQUEST FOR ORAL ARGUMENT

The appellant respectfully requests oral argument.

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. Pro. 32 (a) (7) (b) because this brief contains 11,128 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (a) (7) (B) (iii).

2. This brief complies with the typeface requirement of Fed. R. App. P. 32 (a) (5) and the type style requirements of Fed. R. App. P. 32 (a) (6) because this brief has been prepared in a proportionally spaced typeface **Microsoft Word, in fourteen-point font size using Times New Roman type style**.

3. We understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, we will provide an electronic version of the brief and/or a copy of the word or line print out.

## CERTIFICATE OF SERVICE

We hereby certify that, on September 30, 2013, this Brief of the Appellant was filed in electronic format with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to:

John F. Purcell, Jr.
OFFICE OF THE UNITED STATES ATTORNEY
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4800 Telephone
Jack.Purcell@usdoj.gov

*Counsel for Appellee*

/s/

William A. Mitchell, Jr.

42